In re Jay Allen NEIHEISEL aka Jay Neiheisel, Debtor.

In re. Gordon L. PLANT aka Bud Plant, Debtor.

In re Linda Marie COOPER aka Linda M. Cooper, aka Linda Cooper, Debtor.

In re Thomas R. POYNER, Debtor.

Bankruptcy Nos. 82C–00354, 82C–00384, 82C–00410 and 81C–01981.

United States Bankruptcy Court, D. Utah.

July 26, 1983.

Anna W. Drake, Nielsen & Senior, Salt Lake City, Utah, pro se as trustee in Neiheisel, Plant, and Cooper.

Roger G. Segal, Cohne, Rappaport & Segal, Salt Lake City, Utah, for debtors Neiheisel, Plant, and Cooper.

Sharon Peacock, Asst. Atty. Gen., Salt Lake City, Utah, for state of Utah.

## MEMORANDUM OPINION

GLEN E. CLARK, Bankruptcy Judge.

### INTRODUCTION AND BACKGROUND

Objections to claimed exemptions have prompted the debtors in these chapter 7 cases to challenge the validity of the Utah Exemptions Act[1] under the Constitution of the United States. It is alleged that the Utah law violates the Supremacy Clause of Article VI by frustrating the federal fresh start policy of bankruptcy law.[2]

Debtors claim exemptions for an end table, two chairs, an ottoman, a table with four chairs, a nic-nac table, a chair (*Neiheisel*); four lamps, a kitchen table and four chairs, a rocker, a rocker recliner, two end tables, a coffee table, a corner desk set, a single chest, a single dresser, a toy box, a cedar chest, a night table, two chairs (*Cooper*); and a truck (*Poyner*); Under the Utah Exemptions Act as applied to these debtors, none of these items is exempt and, absent a finding that the Utah Exemptions Act is invalid, each must be surrendered to the trustee in each case for administration for the benefit of creditors.[3]

---

1. 9A Utah Code Ann. §§ 78–23–1 to 78–23–15 (Supp.1981).

2. Debtors *Neiheisel, Plant,* and *Cooper* initially argued, in their reply to the trustee's objections to their claimed exemptions, that the Utah Exemptions Act "violates due process and/or equal protection provided under the 14th Amendment of the United States Constitution." In their "Notice of Intent to Raise Constitutional Issue" filed with the court, however, debtors abandoned their due process and equal protection arguments in favor of their argument that the Utah law violates the Supremacy Clause by frustrating the federal fresh start policy of bankruptcy law. Debtors' briefs in those cases address only their Supremacy Clause argument. Only that argument was presented at oral argument. Thus, debtors' Supremacy Clause argument is the only issue before the court in *Neiheisel, Plant,* and *Cooper.* In *Poyner,* debtor makes the same Supremacy Clause argument made in *Neiheisel, Plant* and *Cooper.* The parties have not raised and the court does not reach the issue of the validity of 11 U.S.C. § 522(b)(1). Arguments and authorities relating to that issue are found in Koffler, "The Bankruptcy Clause and Exemption Laws: A Reexamination of the Doctrine of Geographic Uniformity," 58 N.Y.U.L.Rev. 22 (1983); Peeples and Votta, "The Legislature Strikes Back: Exemptions, Part 2," 18 Wake Forest L.Rev. 1025 (1982). Comment, "Determining the Constitutionality of the Bankruptcy Code 'Opt-Out' Provision: A Critical Look at *In re Sullivan,*" 15 Ind.L.Rev. 849 (1982); Note, "Controversy Surrounding Exemption Uniformity: The Opt-Out Provision of Section 522 of the New Bankruptcy Code," 13 U.Tol.L.Rev. 1111 (1982).

3. Debtors have not requested abandonment of any of the property. In *Cooper,* in response to the trustee's objections to claimed exemptions, debtor argued that all of her claimed exemptions are permissible under the Utah Exemptions Act, citing sections of the Act not originally cited in her schedules. The trustee does not dispute debtor's claims. Thus, no constitutional question is raised in *Cooper.* In *Neiheisel* and *Plant,* debtors claim exemptions in property they value at amounts in excess of the limitation of Section 78–23–8(1)(a) of the Utah Exemptions Act, which provides as follows: "An individual is entitled to exemption of the following property up to an aggregate value of items in each subparagraph of $500: (a) Furnishings and appliances reasonably necessary for one household." In *Neiheisel,* the trustee also objected to claimed exemptions in supplies, provisions, and tools. Debtor responded with arguments that these items are exempt under the Utah law even though others are not. The trustee appears to have abandoned her objections to exemptions in these items. In *Poyner,* debtor claims an exemption in a 1974 truck he needs to drive to work. [Public transportation is not available to large numbers of Utah workers.] The truck is not exempt under Section 78–23–8(2) of the Utah Exemptions Act, which exempts "one motor vehicle having a value not exceeding $1,500 where such motor vehicle is used for the claimant's business or profession" but provides that "[b]usiness or

## SUPREMACY AND FRESH START

In each of debtors' cases, the items claimed as exempt property would have been exempt under 11 U.S.C. § 522(d) if the Utah legislature had not enacted the Utah Exemptions Act, which prohibits debtors from electing the federal exemptions. Debtors persuasively argue that they need each item and that the loss of each item under the Utah law hinders their post-bankruptcy fresh start. Debtors condemn the Utah law as violative of federal fresh start policy because it does not exempt property exempted by Section 522(d). Thus, in debtors' view, the Utah law falls under the weight of the Supremacy Clause. Whether the Utah Exemptions Act is invalid under the Supremacy Clause depends, after ascertaining the construction of both the Utah Exemptions Act and the Bankruptcy Reform Act of 1978,[4] upon whether they are in conflict.[5]

1. *Construction of the Exemptions Provisions of the Bankruptcy Reform Act of 1978.*

Under the Bankruptcy Act of 1898,[6] bankrupts could claim exemptions "prescribed by the laws of the United States or by the State laws in force at the time of the filing of the petition."[7] In 1970, Congress created a Commission on Bankruptcy Laws to "study, analyze, evaluate, and recommend changes" in bankruptcy law.[8] In 1973, the Commission reported its findings to Congress and recommended a revised Bankruptcy Act.[9] The Commission identified two equally important functions of bankruptcy law:

The primary function of the bankruptcy system is to continue the law-based orderliness of the open credit economy in the event of a debtor's inability or unwillingness generally to pay his debts. Especially from creditors' perspectives, it is important to have rules that determine rights generally in the debtor's wealth, wherever situated, and thus guide conduct in the open credit economy, as well as the collective processes which effect such rules and permit creditors to realize on their claims. Especially from debtors' perspectives it is important to have sanctuary from the jungle of creditors' pursuit of their individualistic collection efforts, both under law and outside of the law. Relief by way of stay of collection may be all that is needed. It is equally important to be able to obtain authoritative relief, through discharge, from the hardship of unpaid debts. The second function of the bankruptcy process, on a par with the first, is to rehabilitate debtors for continued and more value-productive participation, i.e., to provide a meaningful "fresh start." In order not to be counterproductive, both the orderliness and distributive functions must be carried out in ways supporting the values on which the open credit economy depends, *viz.,* orderliness, morality and respect, and skill and knowledge.[10]

The fresh start objective would be met, in part, by "preservation of the debtor's property necessary in his household" by means of a uniform Federal exemption which would "set apart such property from that available generally to creditors" so that the debtor could retain "essential goods."[11]

professional use of a motor vehicle does not include transportation to and from a claimant's place of work or business."

4. Pub.L. No. 95–598, 92 Stat. 2549–2688 (1978).

5. *Perez v. Campbell,* 402 U.S. 637, 644, 91 S.Ct. 1704, 1708, 29 L.Ed.2d 233 (1971).

6. 30 Stat. 544 (repealed, Pub.L. No. 95–598, Sec. 401(a), 92 Stat. 2682 (1978)).

7. Bankruptcy Act of 1898, § 6, former 11 U.S.C. § 24.

8. Act of July 24, 1970, Pub.L. No. 91–354, 84 Stat. 468.

9. Communication From the Executive Director, Commission on the Bankruptcy Laws of the United States Transmitting a Report of the Commission on the Bankruptcy Laws of the United States, July 1973, H.R.Doc. No. 137, Parts I, II, and III, 93d Cong., 1st Sess. (1973) [cited herein as Commission Report].

10. Commission Report, *supra* note 9, Part I at 71.

11. *Id.* at 79–80.

The Commission found ineffective the exemption provision of the Bankruptcy Act of 1898: "As a result of the present Act's deference to other federal and state law as to exemptions, there is no uniformity of treatment of creditors and debtors, and the exemptions available are not the result of reasoned policy but the happenstance of history and location. This is intolerable for what is supposed to be a national, uniform system and destructive to the goal of rehabilitation of individual debtors."[12] The Commission's research disclosed that "reference to nonbankruptcy law to determine the exemptions has worked unfairly; it has, contrary to the goals of federal bankruptcy legislation, allowed some creditors to be preferred over others and caused substantial nonuniformity. It has probably also been responsible for some of the dissatisfaction with the bankruptcy process. For example, in states where there are excessive exemptions, creditors have difficulty understanding a system that allows a debtor to retain property of a value of several hundred thousand dollars, while at the same time obtaining a discharge which precludes recovery of the creditors' claims. But it is not only creditors who are dissatisfied; since state procedures must be complied with to perfect exemptions, the right to an exemption is often lost through mistake or inadvertence. In such a case, it is under-

standable that the debtor might fault the system rather than himself."[13]

With these conclusions in mind, the Commission recommended exclusive federal exemptions beginning with a nucleus of "kinds of property that traditionally have been treated as exempt by state governments" with "appropriate federal maximums."[14] Uniformity would avoid "the unfairness of existing state exemption laws, most of which are archaic, some of which are unduly generous, and some of which are exceedingly niggardly, particularly as to urban residents."[15]

Public debate on the Commission's proposal brought the comments of both the National Bankruptcy Conference and the National Conference of Bankruptcy Judges, who "generally approved of federal intervention in the exemption area, but felt that the federal law should only establish a floor, 'leaving the states free to prescribe more generous exemptions for their domiciliaries if they see fit to do so.'"[16] The Commission patterned its exemption provisions after the Uniform Exemptions Act approved in 1976 by the National Conference of Commissioners on Uniform State Laws.[17] The bill proposed by the National Conference of Bankruptcy Judges established uniform federal exemptions as a floor with state exemptions available as an alter-

12. *Id.* at 169.

13. *Id.* at 171.

14. *Id.*

15. *Id.* Professor Frank R. Kennedy, who served as Executive Director of the Commission, explained that "[t]he Commission had proposed a uniform federal exemption. It was concerned about the wide disparity that exists under the present law for the debtor on the East Coast as opposed to the debtor on the West Coast or in Texas where exemptions are exceedingly generous. Congress, you see, since 1898, has deferred to state law in respect to exemptions under the Bankruptcy Act ... So in Texas a debtor can be a fairly wealthy person and yet have no assets for the creditors because all of the property is exempt. At the same time, on the East Coast, the exemptions are relatively stingy. The Commission thought

there ought to be uniformity, and there has been wide approval of that objective. I have always had personal reservations about that matter, but the Commission weighed the competing considerations very well before it adopted a uniform federal exemption recommendation." Kennedy, "New Bankruptcy Act Impact on Consumer Credit," 33 Bus.Law. 1059, 1063 (1978).

16. Trost and King, "Congress and Bankruptcy Reform Circa 1977," 33 Bus.Law. 489, 524 (1978) (quoting from page 356 of the National Bankruptcy Conference's appendix to *Hearings Before the Subcomm. on Civil and Constitutional Rights of the Comm. on the Judiciary on H.R. 31 and H.R. 32,* 94th Cong., 1st and 2d Sess., ser. 27, Appendix (1976).

17. Kennedy, "New Bankruptcy Act Impact on Consumer Credit," *supra* note 15, at 1064.

native, with a $25,000 ceiling.[18] The Commission had rejected that idea for three reasons:

(1) The Commission regarded the laws of some states as unduly generous to debtors, and correcting the imbalance only in favor of debtors struck the Commission as a one-sided approach to the problem presented by the diverse exemption laws.
(2) Allowing the domiciliaries of states with more generous exemptions than those provided by federal law preserves the inequity of the present Act in treating debtors differently because of the accident or the deliberate choice of their domiciles.
(3) Permitting a debtor to choose between federal and state exemptions creates difficult problems involving the relation of state and federal law. *E.g.,* is a homestead claimed by a bankrupt pursuant to Iowa law exempt from claims antedating the acquisition of the homestead, although it is not so exempt under Iowa law? May the recoverability of property transferred without fair consideration prior to bankruptcy and during insolvency depend on whether the bankrupt opts for federal or state exemptions? [19]

The Commission's bill and the bill proposed by the National Conference of Bankruptcy Judges were introduced in Congress in 1973 and 1974. In 1975 and 1976, subcommittees of the House and Senate Judiciary Committees held hearings on the proposed legislation.[20] As might have been expected, witnesses appeared in support of both proposals [21] and in support of alternative exemptions provisions.[22]

From the outset, it was recognized that the Commission's proposal for exclusive federal exemptions was politically sensitive. Professor Charles Seligson, a member of the Commission, warned:

I think we have got to face up to the fact that when you talk about exemptions you are talking about something that seems to be very close to the hearts of those people who administer state governments, states rights, and that does present a problem.[23]

Others agreed. A representative of the American Bankers Association and the Consumer Bankers Association told the Senate Subcommittee

I do not think that you are going to be able to get total uniformity [in exemptions], because I do not believe that States [with exemptions higher than those proposed] are going to be receptive to the reduction in that they feel that it will not afford the proper protection for the consumers or [sic] their States; and

---

**18.** For a comparison of the Commission and Judges bills, *see* Cyr, "Setting the Record Straight For A Comprehensive Revision of the Bankruptcy Act of 1898," 49 Am.Bankr.L.J. 99, 158–160 (1975). Some confusion arose because although the $25,000 ceiling appeared to apply to state exemptions, it was intended to apply only to federal exemptions. *House Hearings, infra* note 20, at 1305.

**19.** Statement of Professor Frank R. Kennedy, *House Hearings, infra* note 20, at 170.

**20.** *Bankruptcy Act Revision: Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary,* 94th Cong., 1st & 2d Sess. (1975–1976) [cited herein as *House Hearings*]; *The Bankruptcy Reform Act: Hearings on S. 235 and S. 236 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary,* 94th Cong., 1st Sess. (1975) [cited herein as *Senate Hearings*].

**21.** For example, *see Senate Hearings, supra* note 20, at 8, 24–25, 29–30, 36, 145–146, 172–173, 477, 483, 489, 537 and *House Hearings, supra* note 20, at 22, 106, 169, 184–185, 1368–1369, 1543, 2094, 2099–2100 and 2140 for support of the Commission's proposal and *Senate Hearings* at 61, 96–97, 120–121, 127, and *House Hearings* at 284–286, 359, 977–978, 1290, 1339, and 1837 for support of the proposal of the National Conference of Bankruptcy Judges.

**22.** Several witnesses found fault with both proposals and made alternative suggestions. For example, *see Senate Hearings, supra* note 20, at 309–311, 316, 322–325, 333–339, 433–434, 440, 558–559, 614, 630, 665–667, 678–681, 814–821, 877 and *House Hearings, supra* note 20, at 369, 788, 937–938, 944, 1256, 1584–1587, 1658, 1674, 1969, 2042–2049, 2075, 2079, 2117.

**23.** *Senate Hearings, supra* note 20, at 30. Professor Seligson addressed the Subcommittee on February 19, 1975.

conversely I do not feel that such States with lower minimums are going to feel at all comfortable with the positions taken by the higher exemption status.[24]

Another witness told the Senate Subcommittee that the exemptions provision of the Bankruptcy Act of 1898 should not be changed because

It allows both State and Federal exemptions. We feel that we do live under a State system as well as a Federal system and the exemptions thought necessary in the different States tend to reflect differences in geography, needs, and philosophy.[25]

Witnesses addressing the House Subcommittee also predicted political obstacles to enacting uniform federal exemptions. Professor Vern Countryman said, referring to the Commission's proposal,

I know there is going to be a lot of opposition in states like Texas and California, where the exemptions are generous.[26]

Attorneys from Texas and California concurred.[27] Referring to the Commission's proposed $500 federal uniform exemption, Professor Phillip Schuchman said that it "is a niggardly exception and the notion that the state should be stuck with that is politically anathema."[28]

Speaking in April of 1976, when the Senate hearings had ended and the House hearings were nearly over, Alan A. Parker, counsel to the House Subcommittee noted that "[w]e have had 35 days of hearings in this Congress. We will finish those hearings by April 30th ... and we will begin to draft. We will begin to draft on the broad outlines of policy which will be set for us by the subcommittee members. To assist them in that regard, we have prepared a kind of checklist of issues ... Some are giving the Committee a great deal of distress and trouble.... [Among these is the question:] What form should exemptions take? And what items should be exempt? Exemptions will give the Congress a great deal of difficulty. The proposals, as you know, are for a federal exemption. In the Judges' Bill you have a federal floor. It is hard to say just what will happen in the area of exemptions. I think at the moment if I had to bet some money on it, it would come out with a federal floor. There are obviously political implications in that decision in terms of states' rights and the votes that occur on the floor."[29]

After the House and Senate hearings were completed, the House Subcommittee drafted a new bill, which was introduced in the House in January of 1977 as H.R. 6.[30] Up to that time, most opposition to federal

---

**24.** Statement of Walter W. Vaughan, *Senate Hearings, supra* note 20, at 135–136.

**25.** Statement of John J. Creedon, American Life Insurance Association, *Senate Hearings, supra* note 20, at 665. *See also* statement of Richard Kaufman, representing the National Association of Credit Management, *House Hearings, supra* note 20, at 1674 (similar statement).

**26.** Statement of Vern Countryman, *House Hearings, supra* note 20, at 358.

**27.** A representative of the Dallas, Texas Bar Association supported minimum federal exemptions, if Congress were to legislate in the area of exemptions at all, but argued that a ceiling on exemptions would interfere with states rights. Statement of L.E. Creel III, Dallas Bar Association, Dallas, Texas, *Senate Hearings, supra* note 20, at 568. *See also House Hearings, supra* note 20, at 1664, 1687, 1691. An attorney practicing in California, a

state whose exemptions were mentioned frequently in the hearings as "liberal," urged the Subcommittee to permit states to grant liberal exemptions: "Progressive states such as California have been continually reviewing and upgrading consumer protection, and, we feel, have a closer and better perspective of consumer needs. The present system has been working well in California, and creditors regulate the extention of credit based on this system. Thus exemptions should be a local matter and the law left as it is." Statement of Robert Ward, *House Hearings, supra* note 20, at 1256.

**28.** Statement of Phillip Schuchman, *House Hearings, supra* note 20, at 869–870.

**29.** "Proposed New Federal Bankruptcy Act," 32 Bus.Law. 247, 263–265 (1976).

**30.** H.R. 6, 95th Cong., 1st Sess. (1977), introduced on January 4, 1977, 123 Cong.Rec. 125 (1977).

exemptions legislation had focused on the drawbacks of placing a ceiling on state exemptions. H.R. 6 set a federal floor for exemptions but permitted states to set higher exemptions. H.R. 6 "provided for exemptions identical to those in the Code as enacted, except that in the Code the dollar amounts per exemption category were reduced, a 'family heirlooms' category was struck, and the state option to deny use of Federal exemptions was added."[31] The dollar amounts proposed in H.R. 6 were identical to the amounts in the Uniform Exemptions Act proposed by the National Conference of Commissioners on Uniform State Laws in 1976.[32] As he introduced H.R. 6, Congressman Edwards explained that federal exemptions were necessary because "many states have not rewritten their exemption laws since the 19th Century, most are outmoded and hopelessly inadequate."[33]

H.R. 6 was replaced by H.R. 7330, 95th Cong., 1st Sess., 123 Cong.Rec. 15,941 (1977) and H.R. 8200, 95th Cong., 1st Sess., 123 Cong.Rec. 35,644 (1977), which, with respect to exemptions, were essentially the same as H.R. 6.[34] On September 8, 1977, after months of effort, the House Committee on the Judiciary submitted its report on H.R. 8200.

H.R. 8200 set a federal floor for exemptions but permitted debtors to choose as an alternative the exemptions provided by state and federal nonbankruptcy law. The House Report on H.R. 8200 explained this provision as follows:

> Under current law, what property is exempt is determined under State law. However, some State exemption laws have not been revised in this century. Most are outmoded, designed for more

rural times, and hopelessly inadequate to serve the needs of and provide a fresh start for modern urban debtors. The historical purpose of these exemption laws has been to protect a debtor from his creditors, to provide him with the basic necessities of life so that even if his creditors levy on all of his nonexempt property, the debtor will not be left destitute and a public charge. The purpose has not changed, but neither have the level of exemptions in many States. Thus, the purpose has largely been defeated.

> Though exemption laws have been considered within the province of State law under the current Bankruptcy Act, H.R. 8200 adopts the position that there is a Federal interest in seeing that a debtor that goes through bankruptcy comes out with adequate possessions to begin his fresh start. Recognizing, however, the circumstances do vary in different parts of the country, the bill permits the States to set exemption levels appropriate to the locale, and allows debtors to choose between the State exemptions and the Federal exemptions provided in the bill. Thus, the bill continues to recognize the States' interest in regulating credit within the States, but enunciates a bankruptcy policy favoring a fresh start.[35]

The Report also explained that Section 522(b) of H.R. 8200 permitted

> an individual debtor in a bankruptcy case a choice between exemption systems. The debtor may choose the Federal exemptions prescribed in subsection (d), or he may choose the exemptions to which he is entitled under other Federal law and the law of the State of his domicile.[36]

H.R. 8200 did not permit states to preempt the federal exemptions.

**31.** Comment, "The General Exemption Section of Section 522(d)(5) of the 1978 Bankruptcy Code," 49 U.Chi.L.Rev. 564, 582–583 (1982).

**32.** Comment, *supra* note 31, at 583 n. 93; Kennedy, *supra* note 15, at 1064.

**33.** 123 Cong.Rec. H21 (daily ed. Jan. 4, 1977) (remarks of Rep. Don Edwards).

**34.** H.R. 7330 and H.R. 8200 deleted a family heirloom exemption from H.R. 6. H.R. 7330 was introduced on May 23, 1977. H.R. 8200 was introduced on July 11, 1977.

**35.** H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 126 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6087.

**36.** *Id.* at 360, U.S.Code Cong. & Admin.News 1978, p. 6316.

On October 27, 1977, Representative Drinan, who had been active in the preparation of H.R. 8200, noted in the House debate on H.R. 8200 that the exemptions provision of H.R. 8200 would "keep many debtors from complete desolation after bankruptcy, and . . . ensure the fresh start." [37]

Also in October 1977, a competing bill, S. 2266, was introduced in the Senate. S. 2266 provided that exemptions would be governed solely by nonbankruptcy law, omitting the House's proposed Federal exemptions floor.

In November and December of 1977, the Senate Subcommittee on Improvements in Judicial Machinery held hearings on the competing House and Senate bills.[38] Several witnesses addressed the exemptions provisions.

Harold Marsh, Chairman of the Commission, argued that if Congress adopted the House's proposal for a federal floor on exemptions, it should also fix a ceiling:

> I certainly do not agree with simply putting in a floor and not putting in any ceiling. The reason always stated for that, of course, is "Well, it will never get through because the Senators from Texas won't let it get through." I happen to be from Texas, and I don't have that low an opinion of the Senators from Texas. I think they might very well recognize that the Texas exemptions are completely out of line in some respects and support such a provision.
>
> At any rate, so far as I know, no one ever asked them. They just say, "Well, we've got to drop that because the Senators from Texas will be against it." I think at least somebody ought to inquire as to whether they will or will not, before this idea is simply abandoned. We need a

national exemption policy in bankruptcy.[39]

Griffin B. Bell, Attorney General of the United States, argued for uniform federal exemptions.[40] The Commercial Law League of America supported H.R. 8200, as did Bankruptcy Judge Joe Lee.[41] The National Consumer Finance Association, without specifically endorsing H.R. 8200, argued that the Senate's exemption provision

> is contrary to the goal of establishing a bankruptcy law that is uniform throughout the nation. Currently state law determines what property is exempt from the bankruptcy estate and experience has demonstrated the unfairness of this system to both debtors and creditors. It is unfair to those debtors who live in states where there are inadequate exemptions to protect property that is necessary to give them a "fresh start," and it is unfair to creditors in states that allow debtors to retain extensive property that should be used to repay at least some of their debts. The Federal Bankruptcy system should determine what property is necessary for debtors, in all states, to maintain an adequate standard of living and to get a fresh financial start, and to protect property, and only that property, with Federal law.[42]

The National Bankruptcy Conference warned the Subcommittee that

> S. 2266 would delete or seriously impair most of the provisions in H.E. [sic] 8200 that make the debtor's fresh start, a basic bankruptcy concept, more meaningful.
>
> .    .    .    .    .
>
> [One] aspect of a meaningful fresh start is exemptions. Presently, the Bankruptcy Act provides an ineffective System by incorporating the exemption laws of the various states. Many States provide lit-

---

**37.** 123 Cong.Rec. H11704 (daily ed. Oct. 27, 1977) (remarks of Rep. Drinan).

**38.** Bankruptcy Reform Act of 1978: Hearings on S. 2266 and H.R. 8200 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Committee on the Judiciary, 95th Cong., 1st Sess. (1977) [cited herein as 1977 Senate Hearings].

**39.** 1977 *Senate Hearings, supra* note 38, at 492.

**40.** *Id.* at 546.

**41.** *Id.* at 619, 684.

**42.** *Id.* at 650.

tle exemption benefits to a debtor. The House Bill also permits the use of State law, but contains a Federal alternative which assures at least uniform minimum benefits. The Senate Bill returns us to the present system which has proven unsatisfactory, as indicated in the previous hearings before the Senate and House Subcommittees and the Report of the Commission on the Bankruptcy Laws of the United States.[43]

Despite these warnings, proponents of the Senate bill did not change their view that states should control exemptions. The Senate Judiciary Committee's report on S. 2266 explained:

Current law is retained in the area of exempt property, which is property that the debtor may retain after bankruptcy for a fresh start. For this purpose, current law adopts the exemption law of the State in which the debtor is a resident. H.R. 8200, the House version of this bill, contains a provision for exemptions that would allow the debtor to choose between State law or Federal exemptions as set by the bill, whichever is higher. H.R. 8200 would establish 11 categories of property for the Federal exemption, among which is a homestead exemption of $10,000. Such a provision in joint cases would result in a husband choosing State exemptions while a wife might choose Federal exemptions. Together, they could thus retain after bankruptcy, very substantial amounts of property, while their debts would have been discharged. The committee feels that the policy of the bankruptcy law is to provide a fresh start, but not instant affluence, as would be possible under the provisions of H.R. 8200. Moreover, current law has allowed the several State legislatures flexibility to meet the needs and fresh-start require-

ments of the debtors of their particular States.[44]

In the September 7, 1978 Senate debate on S. 2266, Senator Wallop, one of the bill's co-sponsors, said that in S. 2266, "[t]he current law allowing states to determine the property exemptions that debtors will have for their fresh start after bankruptcy will be retained."[45] In the same debate, Senator Thurmond supported S. 2266's exemption provisions:

The bill retains current law in the area of exempt property that a debtor may retain after bankruptcy for a fresh start. Thus, the bill takes the approach of current law which adopts the exemption law of the State in which the debtor is located. This method of providing for a fresh start for a debtor is, in my opinion, much better than the approach taken by the House which allows a debtor to choose between State law or Federal exemptions. Unfortunately, this method can lead to the retention of substantial amounts of property, resulting in instant affluence in the face of a bankruptcy proceeding. The fairer way is to allow a fresh start, but on a limited basis.[46]

Section 522(b) as enacted is a compromise between the House and Senate proposals. The following four floor statements were made about the compromise:

(1) Section 522 of the House amendment represents a compromise on the issue of exemptions between the position taken in the House bill, and that taken in the Senate amendment. Dollar amounts specified in section 522(d) of the House bill have been reduced from amounts as contained in H.R. 8200 as passed by the House. The States may, by passing a law, determine whether the Federal exemptions will apply as an alternative to State exemptions in bankruptcy cases.[47]

43. *Id.* at 835.

44. S.Rep. No. 95–989, 95th Cong., 2d Sess. 6 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5792.

45. 124 Cong.Rec. S14719 (daily ed. Sept. 7, 1978) (remarks of Sen. Wallop).

46. *Id.* at 14721–14722.

47. 124 Cong.Rec. H 11095 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards). 124 Cong. Rec. S 17412 (daily ed. Oct. 6, 1978) (remarks of Sen. Deconcini).

(2) In general, the individual debtor is given increased protection and afforded a meaningful fresh start. The code provides uniform Federal exemptions which may be selected by the debtor as an alternative to exemptions under State law unless State law forbids that choice. Strict limits are placed on reaffirmation of consumer debts and the debtor may invalidate liens on certain household items. Finally, the debtor may redeem collateral from a lien.[48]

(3) In the area of exemptions, it was agreed that a Federal exemption standard will be codified but that the States could at any time reject them in which case the State exemption laws would continue to prevail.[49]

(4) In the area of exemptions, we have won an important victory for the rights of States to determine exemptions for the debtors of their States[.] Reduced Federal exemptions will be provided by the law but States by legislation may elect not to have them apply [to] their debtors. This option is most important since many States, such as my own, Wyoming, have been responsive to the needs of debtors and have liberalized exemptions frequently in recent years.[50]

Commentators have described the House-Senate compromise on exemptions as "a strange compromise [leading] to a bizarre result" [51] and as "one of the most peculiar federal-state arrangements on record." [52] Some have lamented what they perceive as the damage done by the compromise to the fresh start for debtors. For example, it has been said that

> The use of state and federal nonbankruptcy laws to determine debtors' exemption rights undermines 'the Congressional policy of a fresh start for a debtor.' (citing the House and Senate Reports) . . . The Act's exemption provision allows the states to regulate the exemption policy *completely.* Considering the tremendous variances in the state exemption laws, there is not *an* exemption policy, but rather numerous, significantly different exemption policies incorporated into the new Act. Because of the significant variances in the exemption policies, Congress has utterly failed to effectuate any '*Congressional* policy of a fresh start for a debtor.' . . . For debtors in states that have both laws that deny the alternative bankruptcy exemption scheme to their residents as well as laws that provide niggardly exemptions, the 'fresh start' concept borders on the meaningless. On the other hand, for debtors in the many states with very liberal exemptions, a 'head start' rather than a 'fresh start' will be the policy. Ironically, this latter result is one that the Senate—the stronger proponent of 'state rights' on the exemption issue—expressly sought to avoid (emphasis in original).[53]

Another commentator argues that although "the 'opt-out' provision appears to retreat from the total commitment to the preservation of the debtor's fresh start manifested by the rest of the Code . . . [t]he degree to

---

**48.** 124 Cong.Rec. H 11116 (daily ed. Sept. 28, 1978) (remarks of Rep. Butler).

**49.** 124 Cong.Rec. S 17404 (daily ed. Oct. 6, 1978) (remarks of Sen. Deconcini).

**50.** 124 Cong.Rec. S 17406 (daily ed. Oct. 6, 1978) (remarks of Sen. Wallop). *But see* Vukowich, *infra* note 53 at 803.

**51.** Aaron, "The Bankruptcy Reform Act of 1978: The Full-Employment-For-Lawyers Bill, Part II: Consumer Bankruptcy," 1979 Utah L.Rev. 1,183.

**52.** Prendergast, "State Secrets," Nat'l.L.J., Apr. 30, 1979, at 8, col. 1, quoted in Rendleman, "Liquidating Bankruptcy Under the '78 Code," 21 Wm. & Mary L.Rev. 575, 651 (1980).

**53.** Vukowich, "Debtors' Exemption Rights Under the Bankruptcy Reform Act," 58 N.C.L.Rev. 769, 801–802 (1980). *See also* Hertz, "Bankruptcy Code Exemptions: Notes on the Effect of State Law," 54 Am.Bankr.L.J. 339 (1980) ("Unfortunately, the political compromise needed for quick enactment of the Code may result in erosion of subsection 522(d)'s benefits.").

which this option conflicts with the basic policies of the Code is, however, unclear."[54]

Whether the opt-out provision conflicts with federal policy requires a determination of what federal policy is.

> If Congress enacted section 522(d) merely for the purpose of releasing debtors from reliance on antiquated state statutes, the option and Code policies are in total harmony. By requiring states affirmatively to deny debtors access to the federal exemptions, the Congress has ensured that states exercising the option will reexamine their own exemption statutes and make a conscious choice between the two provisions.
>
> . . . . .
>
> If, in the alternative, the Code were intended to go beyond this limited goal, it is clear that the 'opt-out' provision detracts from its policy objectives. By granting states the opportunity to maintain their antiquated exemption statutes, the option undeniably reduces, in some measure, the amount of property that certain debtors will retain following bankruptcy.[55]

Commentators agree that the exemptions compromise was a last-minute political expediency.[56] Although courts have disagreed on the meaning of the exemptions compro-

mise, the prevailing view is now represented by the interpretation given the exemptions compromise by the Fifth Circuit:

> Section 522(b) expressly grants the states broad discretion and an open-ended opportunity to determine what property may be exempt from the bankruptcy estate, as long as the state law does not conflict with property exempt under federal law other than the laundry list [in Section 522(d)]. Significantly, the section does not mandate that debtors be guaranteed a right to exempt particular types of property. The unambiguous language of Section 522(b) implicitly indicates a state may exempt the same property included in the federal laundry list, more property than that included in the federal laundry list, or less property than that included in the federal laundry list.

*In re McManus,* 681 F.2d 353, 355 (5th Cir. 1982), *reh. and reh. en banc denied* (1982). The Sixth and Seventh Circuits agree. *In re Sullivan,* 680 F.2d 1131, 1137 (7th Cir. 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 349, 74 L.Ed.2d 388;[57] *Rhodes v. Stewart,* 705 F.2d 159 (6th Cir.1983);[58] *In re Goering,* 23 B.R. 1010 (Bkrtcy.N.D.Ill.1982) (following *Sullivan*). Of the published deci-

---

**54.** Comment, "Protection of a Debtor's 'Fresh Start' Under the New Bankruptcy Code," 29 Cath.U.L.Rev. 843, 856 (1980).

**55.** Comment, *supra* note 54, at 865.

**56.** Aaron, *supra* note 51, at 184; *See* Hertz, *supra* note 53, at 339; Hughes, "Code Exemptions: Far-Reaching Achievement," 28 DePaul L.Rev. 1025, 1027 n. 14 (1979); Rendleman, [Shuchman and Rhorer, "Personal Bankruptcy Data for Opt-Out Hearings and Other Purposes," 56 Am.Bankr.L.J. 1, 2 (1982).] Comment, *supra* note 54, at 864; Comment, "The Bankruptcy Reform Act of 1978: An Exemption Windfall for Joint Debtors?" 18 Cal.W.L. Rev. 80, 94 (1982).

**57.** The Seventh Circuit's ruling implicitly overrules *In re Balgemann,* 16 B.R. 780 (Bkrtcy.N. D.Ill.1982), which held that states "which wish to elect to opt out of the federal exemptions must still provide debtors adequate property for them to begin their fresh starts." *Balgemann,* at 782. The *Balgemann* court concluded that the Illinois exemption laws were invalid because they failed to provide exemptions

"comparable to § 522(d)(5) and 522(d)(3)." *Id.* at 783.

**58.** The Sixth Circuit's ruling overrules the conclusion of the lower court that states do not have unfettered authority to regulate bankruptcy exemptions. *In re Rhodes,* 14 B.R. 629 (Bkrtcy.M.D.Tenn.1981). The lower court had decided that "for a state to effectively opt its citizens out of § 522(d) it must provide a scheme of exemptions which is consistent with [federal] policy" which meant not inconsistent with or more restrictive than the exemptions given in Section 522(d). The *Rhodes* decision by the Sixth Circuit resolves the conflict between *Foster v. City Loan and Savings Co.,* 16 B.R. 467 (D.C.N.D.Ohio 1981) (holding that Section 522(b) provides no limitations on state exemption statutes) and *Curry v. Associates Financial Services,* 11 B.R. 716 (D.C.N.D.Ohio 1981) (holding that a state "cannot merely authorize that the federal exemptions are not available; there also must be concomitant state exemptions sufficient both to protect the debtor from destitution and to provide the basic necessities that will allow the debtor to embark upon a fresh start.")

sions finding that the fresh start policy of bankruptcy law requires states which forbid use of the federal exemptions to provide exemptions "comparable to," "concomitant" with, or "corresponding to" the federal exemptions,[59] only *In re Locarno,* 23 B.R. 622 (Bkrtcy.D.Md.1982), has not been reversed, expressly or impliedly, by a controlling appellate decision.[60] In *Locarno* the court concluded that "[i]n adopting the detailed exemption provisions of 11 U.S.C. § 522(d), Congress implicitly bound the states to adopt a corresponding scheme of exemptions." 23 B.R. at 630.

The disparate positions taken by the parties to these cases reflect the disagreement in the published opinions on whether the fresh start policy of bankruptcy law requires states which forbid use of the federal exemptions to provide exemptions comparable or corresponding to the federal exemptions. While the weight of the case law disfavors the position taken by the debtors in these cases, those decisions may not adequately address debtors' arguments. Thus, some examination of the fresh start concept is appropriate.

Fresh start is a flexible concept, encompassing multiple objectives and manifesting itself in many sections of the bankruptcy code. Because some of the assumptions on which the debtors rely may improperly confine the fresh start concept to its expression in the exemption provisions of the code, some consideration of the meaning of fresh start and its incorporation into the code is necessary.

The fresh start doctrine expresses both humanitarian and economic concerns. In theory, it espouses at least three fundamental tenets: that bankruptcy should not cause destitution by depriving debtors of property necessary for survival, if they have it, that bankruptcy should not create a burden on the state by transforming debtors into public charges, and that bankruptcy should aid in restoring debtors' capacity as

productive participants in the economy. In practice, the fresh start is engendered by exemptions and discharge.

The words "fresh start" or "start afresh" appear in numerous opinions of the Supreme Court, whose words emphasize the role of exemptions and discharge in providing a fresh start. *Traer v. Clews,* 115 U.S. 528, 541, 6 S.Ct. 155, 160, 29 L.Ed. 467 (1885), held that "[t]he policy of the Bankruptcy Act [of 1867] was, after taking from the bankrupt all his property not exempt by law, to discharge him from his debts and liabilities, and enable him to take a fresh start." *Wetmore v. Markoe,* 196 U.S. 68, 77, 25 S.Ct. 172, 176, 49 L.Ed. 390 (1904), held that "[s]ystems of bankruptcy are designed to relieve the honest debtor from the weight of indebtedness which has become oppressive, and to permit him to have a fresh start in business or commercial life, freed from the obligation and responsibilities which may have resulted from business misfortunes." *Burlingham v. Crouse,* 228 U.S. 459, 473, 33 S.Ct. 564, 568, 57 L.Ed. 920 (1913), explained that "[i]t is the twofold purpose of the bankruptcy act to convert the estate of the bankrupt into cash and distribute it among creditors, and then to give the bankrupt a fresh start with such exemptions and rights as the statute left untouched." *See Williams v. United States Fidelity and Guarantee Co.,* 236 U.S. 549, 554–555, 35 S.Ct. 289, 290, 59 L.Ed.2d 713 (1915) (similar statement). *Stellwagen v. Clum,* 245 U.S. 605, 617, 38 S.Ct. 215, 218–19, 62 L.Ed. 507 (1918), held that "[t]he Federal system of bankruptcy is designed not only to distribute the property of the debtor, not by law exempted, fairly and equally among his creditors, but, as a main purpose of the act, intends to aid the unfortunate debtor by giving him a fresh start in life, free from debts, except of a certain character, after the property which he owned at the time of bankruptcy has been administered for the benefit of creditors. Our decisions lay great .stress upon this

---

**59.** See cases cited in notes 57 and 58.

**60.** Judge Schnieder's decision in *In re Locarno* was appealed but the appeal was dismissed.

The Maryland legislature has since amended Maryland's exemption statute, effective July 1, 1983.

feature of the law as one not only of private but of great public interest, in that it secures to the unfortunate debtor, who surrenders his property for distribution, a new opportunity in life."

In making its recommendations in 1973, the Commission informed Congress that for consumer debtors, exemptions and discharge "are essential features of a system of financial rehabilitation of financially troubled individuals." [61] Finding the existing bankruptcy law to be inadequate, the Commission recommended changes intended to enhance the fresh start of consumer debtors. In the area of exemptions, the Commission proposed a uniform federal law, discussed above. But the Commission recognized that "exemptions alone will not insure that the debtor will be able to retain the basic means of survival." [62] Debtors needed federal protection against losing their exemptions. Thus, the Commission proposed to limit waivers of exemptions, to permit avoidance of non-purchase money security interests in property "essential to a debtor's well-being," [63] and to ban reaffirmations. Moreover, the Commission proposed to protect debtors' exemptions by permitting exemptions in property recovered under the avoiding powers, by not requiring debtors to do anything to claim exemptions,[64] and by permitting the ·debtor's spouse or dependents to claim exemptions. Finally, the Commission proposed to

make exemptions effective by expanding the jurisdiction of the bankruptcy court to include all questions regarding exemptions [65] and by permitting redemption of exempt property from liens.

In order to enhance the discharge, the Commission recommended eliminating the false financial statement exception to discharge, permitting a hardship discharge even if a discharge had been granted within five years of the petition, abandoning the concept of provable debts and thus expanding the debts which would be discharged, and liberalizing the discharge of student loans and tax obligations. In addition, the Commission recommended prohibiting reaffirmations, forbidding discriminatory treatment of discharged debts, and expanding the jurisdiction of the bankruptcy court to include all issues relating to the discharge, such as reaffirmation and discriminatory treatment.

These recommendations reveal that the Commission's view of how bankruptcy law should implement the fresh start policy was much broader than the question of property debtors may exempt. While not all of the Commission's proposals found their way into the Bankruptcy Reform Act of 1978, the House and Senate reports on H.R. 8200 and S. 2266 demonstrate that Congress took a broad-based view of the fresh start. Fresh start means more than exemptions.[66]

61. Commission Report, *supra* note 9, at 169.

62. *Id.*

63. *Id.* In the Commission's view, non-purchase money security interests in items such as wearing apparel, household goods, and health aids had "little or no value to a creditor, other than as a means of coercing payment."

64. The proposed bankruptcy administrator would allow exemptions.

65. Under the Act of 1898, the resolution of disputes relating to exemptions was left to the state courts, where debtors were likely to lose exempt property.

66. The converse is also true. Exemptions serve more federal bankruptcy objectives than assisting debtors to make a fresh start. Increased exemptions may reduce the number of

nominal asset cases, thus reducing the costs of the bankruptcy system. The Commission, for example, found that nearly 40% of the 17 million dollar cost of the bankruptcy system in 1972 was for no asset or nominal asset cases. Commission Report, *supra* note 9, at 3. Adequate exemptions also discourage dishonesty in bankruptcy. When needed property is not exempt, debtors may be tempted to conceal assets. Commission Report, *supra* at 82.

Outside bankruptcy, exemptions have served such varied policies as vindicating canons of decency by exempting clothing; attracting settlers by exempting generous homesteads; protecting religious or family ideals by exempting church pews, burial plots, and family bibles; and attracting votes for a state constitution by including liberal exemptions. *See* Vukowich, "Debtors' Exemption Rights," 62 Geo.L.Rev. 779, 782–786 (1974); Comment, "Bankruptcy Exemptions: Critique and Suggestions," 68 Yale L.J. 1459 (1959).

House Report 95–595, 95th Cong., 1st Sess. (1977), the report on the House's proposed bankruptcy bill, most of which ultimately became law, frequently invokes the fresh start in explaining the proposed legislation. For example it was reported that

> This bill attempts to cure . . . inadequacies in the Bankruptcy Act and to prevent the frequent problems confronting consumer debtors that have occurred both in the bankruptcy court and out. First, the bill simplifies, expands, and makes more flexible wage earner plans, . . . Second, many of the provisions in the current bankruptcy law that enable private action to undo the beneficial effects of bankruptcy are changed. Third, the debtor is given adequate exemptions and other protections to ensure that bankruptcy will provide a *fresh start*. Fourth, the bankruptcy system is modified to eliminate the close relationship between a bankruptcy judge and a trustee that often works to the consumer debtor's detriment.
>
> The premises of the bill with respect to consumer bankruptcy are that use of the bankruptcy law should be a last resort; that if it is used, debtors should attempt repayment under chapter 13, . . .; and finally, whether the debtor uses chapter 7, Liquidation, or chapter 13, Adjustment of Debts of an Individual, bankruptcy relief should be effective, and should provide the debtor with a *fresh start*.

House Report, *supra,* at 117–118, U.S.Code Cong. & Admin.News 1978, pp. 6078–6079 (emphasis supplied). The House Committee concluded, referring to debtor relief under chapter 7, that

> Some consumer debtors are unable to avail themselves of the relief provided under chapter 13. For these debtors, straight bankruptcy is the only remedy that will enable them to get out from under the debilitating effects of too much debt. The purpose of straight bankruptcy for them is to obtain a *fresh start*, free from creditor harassment and free from the worries and pressures of too much debt . . . The two most important aspects of the *fresh start* available under the Bankruptcy laws are the provision of adequate property for a return to normal life and the discharge, with the release from creditor collection attempts.

*Id.* at 125, U.S.Code Cong. & Admin.News 1978, p. 6086 (emphasis supplied).

The report called the automatic stay "the first part of bankruptcy relief" and "an element of the debtor's fresh start." *Id.* at 125, 174, U.S.Code Cong. & Admin.News 1978, pp. 6086, 6135.

The law governing exemptions had to be revised because "[m]ost [state exemptions laws] are outmoded, designed for more rural times, and hopelessly inadequate to serve the needs of and provide a fresh start for modern urban debtors . . . H.R. 8200 adopts the position that there is a Federal interest in seeing that a debtor that goes through bankruptcy comes out with adequate possessions to begin his fresh start." *Id.* at 126, U.S.Code Cong. & Admin.News 1978, p. 6087. The House Committee believed its exemption provision would "permit an individual debtor to take out of the estate property that is necessary for a fresh start and for the support of himself and his dependents." *Id.* at 176, U.S.Code Cong. & Admin.News 1978, p. 6136.

A discharge of debts was "the most important element of the fresh start for a consumer debtor after bankruptcy." *Id.* at 128, U.S.Code Cong. & Admin.News 1978, p. 6089. Thus, recognizing that exceptions to discharge are "contrary to the two most

Professor Resnick suggests that exemptions should further one or more of the following social policies: "(1) To provide the debtor with property necessary for his physical survival; (2) To protect the dignity and the cultural and religious identity of the debtor; (3) To enable the debtor to rehabilitate himself financially and earn income in the future; (4) To protect the debtor's family from the adverse consequences of impoverishment; (5) To shift the burden of providing the debtor and his family with minimal financial support from society to the debtor's creditors." Resnick, "Prudent Planning or Fraudulent Transfer? The Use of Nonexempt Assets to Purchase or Improve Exempt Property on the Eve of Bankruptcy," 85 Comm.L.J. 238, 241 (1980).

important principles of the bankruptcy laws: a fresh start for the debtor, and equality of treatment for all debts and creditors," *Id.* at 133–134, U.S.Code Cong. & Admin.News 1978, pp. 6094–6095, the House proposed to narrow the exceptions to discharge. Moreover, the House proposed to remove exceptions to discharge from all statutes other than those contained in the bankruptcy law because "exceptions to discharge not found in the bankruptcy code are subject to the . . . criticism that . . . they are not enacted with the balancing of the myriad competing interests in the bankruptcy arena, and frequently are contrary to the two strong bankruptcy policies of a fresh start for the debtor and the equality of treatment of all creditors." *Id.* at 285, U.S.Code Cong. & Admin.News 1978, p. 6242.

The House proposed to modify the law governing reaffirmations because in the House's view "[t]o the extent that reaffirmations are enforceable, the fresh start goal of the bankruptcy law is impaired." *Id.* at 163, U.S.Code Cong. & Admin.News 1978, p. 6124. H.R. 8200 would have voided any agreement containing a reaffirmation of a discharged debt and would have prohibited a creditor from entering into a reaffirmation agreement. In the House's view, its provision on reaffirmations was "a significant factor in making bankruptcy relief an effective remedy." *Id.* at 164, U.S.Code Cong. & Admin.News 1978, p. 6125. It would ensure "that a debtor will not come out of bankruptcy in the same situation as when he went in" and contribute "to the debtor's fresh start."

In Section 525 of H.R. 8200, the House proposed a prohibition of certain discriminatory treatment because discrimination based on nonpayment of debts discharged in bankruptcy was found to be "seriously detrimental to a debtor's fresh start." *Id.* at 165, U.S.Code Cong. & Admin.News 1978, p. 6126.

The House bill proposed to abolish former law's concept of provability, under which debtors in liquidations cases were unable to obtain a discharge claims not provable, so as to "permit a complete settlement of the affairs of a bankrupt debtor, and a complete discharge and fresh start." *Id.* at 180, U.S.Code Cong. & Admin.News 1978, p. 6141.

Certain tax claims were to be given priority in distribution "in order to aid the debtor's fresh start." *Id.* at 190, U.S.Code Cong. & Admin.News 1978, p. 6150. "By granting the nondischargeable tax a priority, more of it will be paid in the bankruptcy case, leaving less of a debt for the debtor after the case." *Id.*

The House bill proposed to delete from federal law provisions for penalties, such as denial of a license, grant, or entitlement, imposed for filing bankruptcy because they "are clearly contrary to the fresh start policy of the bankruptcy laws." *Id.* at 286, U.S.Code Cong. & Admin.News 1978, p. 6243. The House was "convinced that bankruptcy per se is not something to be punished. Too often, a personal bankruptcy is caused by circumstances beyond the control of the debtor. Excessive emergency medical bills, illness, job layoffs, tort judgments resulting from accidents, and general economic reverses all contribute to individual bankruptcies. These causes are not in themselves adequate grounds on which to deny an individual a license to work after a bankruptcy. To do so would negate the beneficial effects of the protections of the bankruptcy laws, and would prevent rather than facilitate a fresh start." *Id.*

Section 522(f) of H.R. 8200, permitting the debtor to avoid judicial and nonpurchase-money liens on exempt property was intended to protect "the debtor's exemptions, his discharge, and thus his fresh start." *Id.* at 362, U.S.Code Cong. & Admin.News 1978, p. 6318.

Section 523(d) of the House bill entitled debtors to costs of and a reasonable attorney's fee for a proceeding to determine the dischargeability of a debt on grounds of fraud, if the creditor initiated the proceeding and the debt was determined to be dischargeable. This provision was designed to "discourage creditors from initiating false financial statement exception to dis-

charge actions in the hopes of obtaining a settlement from an honest debtor anxious to save attorney's fees" because "[s]uch practices impair the debtor's fresh start." *Id.* at 365, U.S.Code Cong. & Admin.News 1978, p. 6321.

Section 727, providing for the discharge, was described as "the heart of the fresh start provisions of the bankruptcy law." *Id.* at 384, U.S.Code Cong. & Admin.News 1978, p. 6340.

Senate Report 95–989, 95th Cong., 2d Sess. (1978), on Senate Bill 2266, the Senate's proposed bankruptcy legislation, also made frequent reference to the fresh start. Its provisions for redemption of property from liens were "added to aid the consumer debtor in making a fresh start after bankruptcy." Senate Report, *supra,* at 7, U.S. Code Cong. & Admin.News 1978, p. 5793. The Senate Report repeated the statement of the House Committee that the discharge is "the heart of the fresh start provisions of the bankruptcy law." *Id.* The Senate would defer to state exemption law because "the policy of the bankruptcy law is to provide a fresh start, but not instant affluence, as would be possible under the provisions of H.R. 8200. Moreover, current law has allowed the several State legislatures flexibility to meet the needs and fresh start requirements of the debtors of their particular States." *Id.* at 6, U.S.Code Cong. & Admin.News 1978, p. 5792. "To avoid unduly burdening the debtor's fresh start," the Senate bill proposed to continue "the basic coordination of priority and discharge provisions that apply to taxes, so that unpaid taxes accorded priority are nondischargeable, and tax claims which are not given priority are, with some exceptions, not collectible from the debtor's post-bank-

ruptcy assets." *Id.* at 14, U.S.Code Cong. & Admin.News 1978, p. 5800.[67]

The record of proposed bankruptcy legislation, beginning with the Commission's report in 1973 and ending with the Bankruptcy Reform Act of 1978, demonstrates that the fresh start doctrine has been a major force behind suggested reforms. But the theoretical aspirations of proposals to enhance the fresh start of debtors have been counterbalanced in reality both by creditors' demands for protection and by resistance to federal control of local affairs.[68] Congress, after examining many proposals designed to further the fresh start, ultimately selected only some. A fresh start was provided but, in the words of Senator Thurmond, only "on a limited basis."[69]

The Bankruptcy Code legislates many reforms favorable to a fresh start for debtors. Among these are expanded jurisdiction, a liberalized discharge, a broadened automatic stay, enhanced avoiding powers, new rights of redemption, and potent restrictions on post-bankruptcy treatment of discharged debtors. Exemptions, although quantum and category are left to the states, are made both easier to claim and harder to lose. These reforms have been called "an interlocking network of protections capable of assuring debtors a fresh start."[70] In the political give and take surrounding the Bankruptcy Reform Act, many proposals to enhance the fresh start were lost to compromise, including proposals to ban reaffirmations, eliminate the false financial statement exception to discharge, and extend by statute the prohibition of post-discharge discrimination to private parties. The concept of minimum federal exemptions, like other proposals favorable to debtors, was abandoned in an effort to acquire votes.

**67.** Apparently overlooking these and other statements of Senators and Senate Committees, a panel of the Seventh Circuit Court of Appeals erroneously concluded that "the intention of providing a 'fresh start' can be attributed only to the House." *In re Sullivan,* 680 F.2d 1131, 1136 (7th Cir.1982), *cert. denied* —— U.S. ——, 103 S.Ct. 349, 74 L.Ed.2d 388.

**68.** States rights wranglings over bankruptcy exemptions are not new to congressional devel-

opment of bankruptcy legislation. *See* Warren, Bankruptcy in United States History 100, 103, 110–112, 149–151 (1935). State control of exemptions has always been "precious to the judgment, conscience, and heart of the Western man." *Id.* at 103.

**69.** *See* note 46, *supra.*

**70.** *Comment, supra* note 54, at 850.

The exemptions compromise enacted by Section 522(b)(1) was not the resolution of a battle between forces favoring and opposing a fresh start. Both the House and the Senate recognized a fresh start as a desirable goal of bankruptcy law. Their disagreement centered on whether Congress or the states should possess authority to fix exemptions. The House feared state stinginess. The Senate feared state munificence. By permitting states to forbid federal exemptions, the compromise left decision making authority on types and amounts of exemptions with the states. Thus, "[e]ach chamber's position became realizable, depending on the action of state legislatures. The Senate position would prevail in the states that enacted legislation to deny their residents the alternative bankruptcy exemption. The House position would be realized in states that did not enact 'opt out' legislation." [71] And even in states enacting "opt out" legislation, "the Congress has ensured that states exercising the option will reexamine their own exemption statutes and make a conscious choice between the two provisions," thus alleviating the problem of "local legislative neglect in maintaining and reviewing state exemption laws." [72]

2. *Construction of the Utah Exemptions Act.*

In 1981, Utah banned the use, by Utah debtors in bankruptcy, of the federal exemptions by enacting the Utah Exemptions Act. The Utah Exemptions Act, like Section 522(d), is drawn from the Uniform Exemptions Act. The Utah Act is largely the product of the Judiciary Study Committee, an interim committee created by the Utah legislature which, with the assistance of the Utah legislature's Office of Legislative Research, met, considered, and drafted the Act during 1980.

After the legislature constituted the committee, the Office of Legislative Research prepared a memorandum to committee members as an "overview of exemptions from execution statutes and the impact of recent federal statutory changes in the bankruptcy laws." [73] The memorandum said exemption statutes "are not intended to be generous but have been enacted only to allow the debtor to retain minimum amounts of property essential to sustain his livelihood," noted that the existing Utah exemptions statute was out of date, explained that the bankruptcy law permitted states to preempt the use of federal bankruptcy exemptions, and argued that "whether the committee decides to maintain the status quo of a choice between the two sets of exemptions or to preempt the federal exemptions in bankruptcy actions an overhaul of the current exemption statutes is imperative." Committee members received copies of the existing Utah exemptions statutes and the Uniform Exemptions Act.

On March 9, 1980, the committee met to hear a presentation by the Utah Office of Legislative Research on the purpose of exemptions and "the deficiencies in the present Utah Statute." [74] The committee reviewed the March 12 memorandum and requested copies of the exemption laws of some other states. [75] Committee members received copies of the exemption statutes of Arizona, California, and Virginia.

71. Vukowich, *supra* note 53, at 774.

72. Comment, *supra* note 54, at 865. Although another commentator apparently would question this conclusion, in Utah, as will be seen below, a reexamination of exemption laws took place. *See* Woodward, "Exemptions, Opting Out, and Bankruptcy Reform," 43 Ohio St.L.J. 335 (1982) ("most of the thirty-two states that have chosen to opt out have done only that and simply stated ... that their debtors are not authorized to utilize the exemption provisions contained in the Bankruptcy Code.")

73. "Exemptions From Execution Study," Memorandum from Roger O. Tew, Research Analyst, Office of Legislative Research, to Judiciary Study Committee Members (March 12, 1980). This item, and other Utah legislative materials referred to herein, were obtained from the Utah Office of Legislative Research, 436 State Capitol, Salt Lake City, Utah.

74. Minutes of the Judiciary Study Committee of the Utah Legislature, March 9, 1980, at 3, ¶ 5.

75. *Id.* at 4.

On April 6, 1980, the committee reconvened to consider "(1) Whether Utah's statutes should be updated, and how, [and] (2) Whether the federal bankruptcy exemptions should be preempted." [76] At this meeting, the committee voted to update Utah's exemption law and to preempt the federal exemptions. On request of the committee, five attorneys addressed the committee: an attorney employed by Utah Legal Services, two bankruptcy trustees, counsel for a creditors' organization and the Clerk of the United States Bankruptcy Court for the District of Utah.

According to the minutes of the meeting, which summarize rather than quote the proceedings, the Legal Services attorney advocated an update of Utah's "completely archaic" exemption laws and said he did not oppose state preemption of the federal exemptions if the legislature undertook a comprehensive review of Utah's exemption laws.

One of the bankruptcy trustees indicated that the federal exemptions "should not be considered, per se, more liberal than the state provisions;" raised "some concern over the federal homestead exemption ... [which, because it applies to personal property is] a fairly broad option for a debtor;" "stated that most debtors are not informed enough to choose bankruptcy simply because of the exemptions available;" attributed the large number of bankruptcies to "the general state of the economy rather than the new bankruptcy law;" and questioned "whether more restrictive exemption provisions would result in more return to creditors." [77]

The other trustee said that "in bankruptcy proceedings, under the old bankruptcy law, there was more return to creditors than ... under the new law," citing as the "prime reason" the "very broad homestead exemption which shelters up to $15,000 for a married couple." Although the trustee agreed that increased bankruptcy filings reflected the state of the economy, "he knew of cases where filings had been postponed to take advantage of the new bankruptcy law." [78]

Counsel for the creditors' organization "stated that his organization was categorically in favor of Utah preemption [of] the federal bankruptcy provisions" but also "stated ... that he felt Utah's exemption laws were in need of a complete revision." He expressed concern about the "broad homestead language contained in the federal statute and felt it needed to be limited in its application." In his opinion, "the new bankruptcy laws had a negative impact on consumer loans because of the restriction on non-purchase money security interests in household goods." He explained that because federal law, unlike Utah law, does not limit exemptions in household items to necessities, "T.V.'s, stereos, etc. which are prime collateral for consumer loans are exempted." [79]

The clerk of the bankruptcy court "provided statistics on the current rise in bankruptcy filings" and "in response to committee questions ... indicated that the state of the economy and not the changes in the bankruptcy laws themselves, was the prime motivator for such increases." [80]

After hearing these statements, the committee requested its staff to draft "an updated exemptions from execution bill to include a clause requiring the use of such exemptions in bankruptcy proceedings in Utah." [81]

By the June 18, 1980 committee meeting, a draft exemptions bill had been prepared. The proposed bill "had been drawn from the model exemption statute." [82] The committee voted to adopt the language prepared

**76.** Minutes of the Judiciary Study Committee, April 6, 1980, at 3, ¶ 3.

**77.** *Id.*

**78.** *Id.*

**79.** *Id.* at 4.

**80.** *Id.*

**81.** *Id.*

**82.** Minutes of the Judiciary Study Committee, June 18, 1980, at 1.

by its staff preempting the use of the federal exemptions in Utah and then turned to the proposed exemptions bill.[83]

The June 18th draft bill made additions to and deletions from the Uniform Exemptions Act. Like the Uniform Act, the draft bill included periodic adjustment of dollar amounts. The committee voted unanimously to delete this provision. The draft bill proposed a homestead exemption of $10,000 for an individual, $5,000 for an individual's spouse, and $1,000 for each dependent. The committee voted, after argument by one member that "he was concerned over the fact that an individual could claim excessive exemptions in the provisions," to approve this exemption. The draft bill gave, as does the Uniform Act, a $500 exemption in cash and other liquid assets to individuals claiming a homestead exemption and $1,500 to individuals not claiming a homestead exemption. The committee decided to excise this exemption. Wedding and engagement rings were exempt under the draft bill. A committee member "indicated that he had had experience with individuals buying wedding rings as an exemption and felt that the present language was ambiguous." Another member moved to delete all reference to wedding rings. After a substitute motion to grant a $500 exemption in wedding rings failed, the committee voted to remove all reference to wedding rings. Next, the committee chose to erase the draft bill's exemption of "one motor vehicle to the extent of a value not exceeding $1,000.00" and to substitute a $1,000 exemption in a motor vehicle "as a tool of trade."

When the committee reconvened on July 16, more changes were made.[84] The committee recommended a repeal of former Sections 28–1–1 et seq. relating to the homestead exemption and the inclusion of all homestead provisions in the new statute. The committee also agreed to permit single individuals to claim a homestead exemption.

The draft bill prevented courts from authorizing a levy respecting exempt property subject to a non-purchase money security interest if the debtor lacked the means to pay all or part of the debt and continued possession and use of the item was necessary to avoid undue hardship. The committee cancelled this provision. The committee also voted out the bill's ban on non-purchase money security interests in certain property.

After the draft bill left the Judiciary Study Committee with a favorable recommendation, it was taken up by the House Committee on the Judiciary. On February 16, 1981, that committee reported the bill favorably, with minor amendments.[85] On March 3, 1981, the Senate Judiciary Committee recommended more amendments to the bill, including a reduction in the amounts of the homestead exemption for $10,000 to $8,000 for an individual, from $5,000 to $2,000 for a spouse, and from $1,000 to $500 for dependents.[86] The Senate Committee also favored the bill.[87] Both House and Senate approved the bill, which became law on May 12, 1981.

The Utah Exemptions Act represents an effort not only to preempt federal exemptions in bankruptcy, but to modernize Utah exemption law. Antiquated exemptions for animals and farming and mining implements were revised. New categories of exempt property were created.[88]

**83.** *Id.* at 1–2.

**84.** Minutes of the Judiciary Study Committee, July 16, 1980.

**85.** For example, the committee increased the exemption for a motor vehicle used in a debtor's trade or profession from $1,000 to $1,500 and reduced the exemption for provisions sufficient for one year to three months. Letter from Dale E. Stratford, Chairman of the House Committee on the Judiciary, to the Speaker of the House, February 16, 1981, reprinted in the Journal of the Utah House of Representatives, Day 37, page 499 (Feb. 17, 1981).

**86.** Minutes of the Judiciary Senate Standing Committee, March 3, 1981.

**87.** Journal of the Utah Senate, Day 51, page 709 (March 3, 1981).

**88.** A thoughtful treatment of the Utah Exemptions Act is found in a student comment published in 1982 UTAH L.REV. 130.

A comparison of the Utah and federal exemptions reveals that the Utah law is in some respects less generous to debtors than the federal statute and in others more generous. For example, the Utah statute exempts, without limit, compensatory proceeds of insurance, a judgment, or a settlement as a result of bodily injury to a debtor.[89] The federal statute limits that exemption to $7,500.[90] Tools of the trade and professional books are exempted up to a value of $1,500 under the Utah statute.[91] The federal limit is $750.[92] The federal statute permits an individual to exempt $7,500 for a residence and to add any unused portion to the $400 exemption in any property.[93] The Utah statute permits an individual to exempt $8,000 in a mobile home used as a residence or in any real property but, unlike the federal law, does not permit application of any unclaimed portion to other property.[94] The *federal* statute exempts $1,200 in value in a car.[95] The Utah statute exempts $1,500, but only if the car is used in the debtor's business, not including commuting.[96]

The new Utah Exemptions Act grants both broader and narrower exemptions than did the former Utah exemptions law. For example, the new law permits a mechanic or artisan to exempt $1,500 worth of tools.[97] Former law exempted only $500.[98] On the other hand, former law exempted a teamster's truck without a value limit while the new law exempts only $1,500 in value.[99] The new statute exempts, without limitation, one freezer, burial plots, necessary health aids, disability benefits, and child support.[100] None of these was exempted by the former statute. Under former law, the law library of lawyers was exempt without limitation.[101] The new law exempts only $1,500 in value.[102]

In some categories of property the new Utah Exemptions Act did not enlarge the former Utah exemptions. For example, under the old law, a debtor could exempt "chairs, tables and desks to the value of $200" and "necessary household table and kitchen furniture belonging to the judgment debtor to the value of $300."[103] Under the new law, debtors may exempt $500 worth of "furnishings and appliances reasonably necessary for one household."[104] Both laws exempt provisions sufficient for three months.[105] Both exempt, without dollar limitation, one refrigerator, one stove, one sewing machine, and all carpets in use.[106]

A powerful stimulus for the passage of the Utah Exemptions Act was the desire to curb rising rates of bankruptcy filings. 1979 brought record numbers of bankruptcy filings in Utah. 1980 saw even more filings. Newspaper articles and editorials marveled at the mushrooming numbers. *See,* for example, Deseret News, "Utah Bankruptcy Filings Twice U.S. Average" (Nov. 22, 1979); Deseret News, "Counseling to Combat Rise in Bankruptcies" (Mar. 22, 1980); Salt Lake Tribune, "Bankruptcies

89. Section 78–23–5(9).

90. Section 522(d)(11)(D).

91. Section 78–23–8(2).

92. Section 522(d)(6).

93. Sections 522(d)(1) and 522(d)(5).

94. Section 78–23–3(1).

95. Section 522(d)(2).

96. Section 78–23–8(2).

97. Section 78–23–8(2).

98. Former Section 78–23–1(4) (repealed 1981).

99. *Compare* former Section 78–23–1(6) with present Section 78–23–8(2).

100. Section 78–23–5.

101. Former Section 78–23–1(4) (repealed 1981).

102. Section 78–23–8(2).

103. Former Sections 78–23–1(1) and 78–23–1(2).

104. Section 78–23–8(1)(a).

105. *Compare* Section 78–23–5(7) with former Section 78–23–1(2).

106. *Compare* Section 78–23–5(7) with former Section 78–23–1(2).

Zooming for Utahns," C6–5 (Apr. 22, 1980); Deseret News, "Utah Sees Surge in Bankruptcy" (Jul. 28, 1980); Deseret News, "Many Turn to Bankruptcy Court" (Jul. 28, 1980); Deseret News, "Is Utah Becoming Bankruptcy Capitol of the World?" (Jul. 28, 1980); Deseret News, "Utah Bankruptcy Cases in Line with National Average" (Sept. 1, 1980). Some newspaper articles blamed the federal exemptions for increased filings:

> We had bankruptcies going down eight years in a row up to 1978 when the new liberal laws were passed. Then last year [1979] they jumped back up. Its just too easy. You can exempt jewelry, furniture, home, car . . . it makes an easy out for your responsibilities.

"Counseling to Combat Rise in Bankruptcies," *supra* (quoting the executive director of the Consumer Credit Counseling Service of Utah, Inc.). An editorial opined that

> More bankruptcies have been filed in [the] U.S. Bankruptcy Court for Utah so far this year than were filed all of last year. Some say the increase is a result of a new law that went into effect Oct. 1. Others say its a growing population and a declining economy. More than likely, its a combination of all of these.

> .    .    .    .    .

> The reason the new law is blamed for the increase is because it is more lenient in the area of what a person who goes bankrupt can keep. The person can keep up to $7,500 in real estate ($15,000 for a couple who file jointly and the amount can be applied to something else if the person has no real property); $1,200 for a motor vehicle, various household items and clothing not to exceed $200 each in value, up to $100 in personal jewelry; $750 in tools of a trade; and other items, including certain life insurance policies, health aids and alimony.

"Utah Sees Surge in Bankruptcy," *supra.*

In November 1980, the Utah Foundation, a private research organization, published and circulated to all Utah legislators a research report supporting opt out legislation:

> During the past year there has been a dramatic surge in the number of estates filing for bankruptcy in Utah. . . . The newly created exemption provisions of the Federal Reform Act are much more liberal than Utah's current provisions. . . . This makes the bankruptcy alternative attractive to more individuals. . . . While the economy may be the major reason for the great increase in the number of bankruptcies in Utah, the more liberal exemption provisions under the new federal law also are a factor in the increase of filings. . . . The Interim Judicial Study Committee of the Utah State Legislature will propose a bill to the 1981 General Session which would modernize the state exemption provisions and would preempt the federal exemptions. . . . The preemption of most of the federal exemption regulations tightens the type and amount of personal property which may be exempted. This would be the most significant change in the law. "Preemption" would allow the Utah legislature to control that one area of bankruptcy law that they can effect. Future modification of the exemption provisions would be based on the decisions of the Utah legislature and not the national congress. Proponents claim that the proposed Utah law would help restore the general intent of bankruptcy law—to be equitable and fair to debtor and creditor alike. In this way, it might stem the rapid rise of bankruptcies in Utah.

Utah Foundation, Report No. 409, "Bankruptcy and Utah's Exemption Laws," (Nov. 1980); *See also* Deseret News, "Bill Proposed to Tighten Bankruptcy Exemptions" (Nov. 3, 1980); Salt Lake Tribune, "Utah Law Would Limit Bankruptcy Exemptions" (Nov. 4, 1980).

After the Interim Committee had favorably reported the draft exemptions bill, the Deseret News noted that sponsors of the proposed bill "hope the proposed law will help reduce the number of bankruptcy filings in the state." Deseret News, "Recession Deep, Bankruptcy Filings Show" (Jan. 31, 1981). The Salt Lake Tribune accurately predicted that 1981 could be another rec-

ord year for bankruptcy filings in Utah. Salt Lake Tribune, "Bankruptcies Stagger Court," C3–1 (Feb. 26, 1981).

Enactment of the Utah Exemptions Act precipitated an avalanche of bankruptcy filings on the eve of its effective date. It was reported that

> A record number of bankruptcies were filed in the Federal Bankruptcy Court Monday [May 11, 1981], with 339 individuals representing 214 cases, waiting in line to file bankruptcy. One court source said people stood in line until 7 p.m. to beat the dead line. On Tuesday a new more conservative state bankruptcy law took effect.... The rush of bankruptcies was caused by people trying to take advantage of the more-lenient $7,500 federal exemption.

Deseret News, "339 Line Up To Beat Stricter Bankruptcy Law," (May 12, 1981). In August of 1981, the Utah Foundation circulated a research report claiming the new law had reduced filings:

> Following the effective date of the Utah law, bankruptcy filings dropped off noticeably. In June, for example, there were 50% fewer filings than the total for May. In July there were 54% fewer than May and 7% fewer than June.

Utah Foundation, Research Briefs, No. 81–14. "New Law Slows Bankruptcy Growth in Utah" (Aug. 24, 1981); *See also* Deseret News, "New Laws Slowing Bankruptcy Filings" (Aug. 24, 1981); Salt Lake Tribune, "Bankruptcy Rate Slows—New Utah Law Cited," C4–3 (Aug. 25, 1981). But the Utah Foundation's statistics, because they compared June and July 1981 filings with May 1981 filings, reflected only the unprecedented number of filings before the effective

date of the Utah Exemptions Act. In fact, more bankruptcy cases were filed in Utah in 1981 than in any other year. And although fewer Utah bankruptcy cases were filed in 1982 than in 1981, more were filed in 1982 than in 1980. *See* Administrative Office of the United States Courts, Federal Judicial Workload Statistics (December 31, 1980) (December 31, 1981) (December 31, 1982). 1983 filings at the current rate will exceed the record 1981 level.[107]

The Utah Exemptions Act may or may not be good policy, as a matter of state law. That question, however, is for the Utah legislature to resolve. The permissible inquiry in this case is limited to the construction to be given to the Utah Exemptions Act for purposes of deciding whether it conflicts with federal law. To the extent that the court has been able to examine the legislative history of the Utah Exemptions Act, it appears that the intention of the Utah legislature was to modernize and consolidate Utah exemption law and, at the same time, to preempt federal exemptions to reduce bankruptcy filings. Because the Utah statute is in some respects more and in some respects less generous than the federal statute, it may be incorrect to conclude that the Utah legislature meant to set exemptions · generally below the levels set by Congress. In specific instances, however, that is the case. Debtors in these cases possess property not exempt under Utah law which would have been exempt under Federal law. Overall, however, the Utah statute grants exemptions in some property which will aid debtors in their fresh start.

When a Utah statute grants an exemption, the Utah Supreme Court has consist-

---

**107.** Empirical studies of filings in other jurisdictions suggest that the categories and amounts of exemptions available to debtors may have little or nothing to do with the rate of bankruptcy filings. *See* Shuchman and Rhorer, *supra* note 56 at 2–3 ("We have no reliable indications of whether these state actions [opting out of the federal exemptions] have curbed the rise of bankruptcies in those states. Preliminary indications ... are that the increase in filings occurred independently of the new exemptions."); Woodward and Woodward, "Ex-

emptions as an Incentive to Voluntary Bankruptcy: An Empirical Study," 57 Am.Bankr.L.J. 53, 68 (1983) ("[S]tates that have eliminated the disparity between exemptions available to debtors outside of bankruptcy and those available to debtors in bankruptcy have not realized significantly lower bankruptcy rates than those states which have continued to allow debtors access to the Code's relatively higher bankruptcy exemptions ... [Reducing] the present level of federal bankruptcy exemptions will have an insignificant effect on bankruptcy rates.").

ently applied a liberal construction in favor of debtors to protect debtors and their families from hardship. *Miller v. Givan,* 7 Utah 2d 380, 325 P.2d 908 (1958); *Spangler v. Corless,* 61 Utah 88, 211 P. 692 (1922); *Lindquist v. Clayton,* 54 Utah 79, 179 P. 655 (1919).

3. *Analysis of the Alleged Conflict Between the Bankruptcy Reform Act of 1978 and the Utah Exemptions Act.*

Debtors allege two conflicts between the Bankruptcy Reform Act of 1978 and the Utah Exemptions Act. First, it is said that because the Utah law is not as generous to debtors as Section 522(d) it undermines the federal policy of granting debtors a fresh start. Stated differently, it is argued that the Utah Exemptions act offends federal policy because it deprives debtors of property Congress indicated in Section 522(d) to be essential to a debtor's well being and fresh start. A corollary of this argument is that because the Utah Exemptions Act, unlike Section 522(d), does not permit the homestead exemption to be claimed in any property, but instead limits the homestead exemption to real property or a mobile home, it discriminates against persons who do not own real estate or a mobile home, thus violating the federal policy behind Section 522(d)(5) to provide equal treatment to owners and nonowners of real property.

Second, it is intimated that because the Utah Exemptions Act did not increase the $500 limit for household furnishings above the former limit, which was enacted in 1951, it violates a federal policy of encouraging states to revise their exemption statutes to meet debtors' current needs.

These arguments are unpersuasive. The Utah Exemptions Act is expressly authorized by Section 522(b)(1), under which states may preempt Section 522(d). Although the Bankruptcy Reform Act expresses in many ways a federal policy favoring a fresh start

for debtors, federal policy does not include minimum federal exemptions. That idea was proposed, but was rejected. Thus, debtors' argument that states must conform their exemption laws to Section 522(d) is without merit. Nothing in the Bankruptcy Reform Act of 1978 requires states which preempt the use of federal exemptions to provide exemptions comparable to, concomitant with, or corresponding to the exemptions found in Section 522(d), either in category or amount. The history of the exemptions compromise supports this conclusion. If Congress had intended to require states to provide exemptions concomitant with those found in Section 522(d), it would have been easy to say so. Nothing was said. Moreover, Congress, having before it all of the arguments against permitting states to fix exemption levels, nevertheless permitted states to do so. An inevitable consequence of permitting states to control types and amounts of exemptions is disparity. Thus, that states may set exemptions at levels lower or higher than those fixed by Congress is federal policy. The Utah Act, which does both, is consistent with that policy.[108]

Nor are the states required, in enacting exemption laws, to embrace policies imbedded in Section 522(d). It has been found, for example, that Section 522(d)(5), by permitting non-homeowners to apply the unused portion of the federal homestead exemption to any property, "was intended to ensure that there was no discrimination between homeowners and non-homeowners" in achieving a fresh start. *In re Smith,* 640 F.2d 888, 891 (7th Cir.1981). The Utah Exemptions Act has no similar provision. But nothing in the Bankruptcy Reform Act requires it to. Although Congress adopted a non-discrimination policy in Section 522(d), it permitted the states to preempt Section 522(d).[109] Finally, if Section 522(b)(1) re-

108. In reaching this conclusion, the court need not subscribe to the *Foster* dictum that "a state could opt out of the federal exemption system and conceivably provide its debtors with absolutely no exemptions." 8 B.C.D. at 362, 16 B.R. 467. Utah law provides exemptions. Moreover, that question is not likely to arise in Utah because Art. XXII, Section 1 of the Utah Constitution requires the legislature to provide at least a homestead exemption.

109. *Accord, In re Parrish,* 19 B.R. 331, 335 (Bkrtcy.D.Colo.1982). Although states may preempt Section 522(d), Section 522(b)(1) does

flects federal policy to encourage states to modernize outmoded exemption statutes, that policy was served by the Utah Exemptions Act taken as a whole even though a few categories of exempt property remained the same.

Whether Section 522(b)(1) was a good idea, as a matter of federal law, is for Congress to decide. Absent constitutional defects in a statute, judges "cannot override the specific policy judgments made by Congress in enacting . . . statutory provisions." *U.S. v. Sotelo,* 436 U.S. 268, 279, 98 S.Ct. 1795, 1802, 56 L.Ed.2d 275 (1978). Having determined what Section 522(b)(1) means in these cases, it is the court's duty to enforce the statute. The objections to the claimed exemptions in these cases are sustained. Nothing in this decision precludes debtors from requesting abandonment of non-exempt property of inconsequential value or burdensome to the estate.

Alan Peterson, Steele, Klos & Flynn, Chartered, La Crosse, Wis., for plaintiff.

Gene B. Radcliffe, Radcliffe & Laabs, Black River Falls, Wis., for defendant.

not permit states to preempt other subsections of Section 522.